Case number 17-2305 Oldnar Corporation v. Sanyo North American Corporation et al. And case number 17-2379 Oldnar Corporation v. Sanyo North American Corporation et al. All arguments not to exceed 15 minutes per side. Ms. Katherine Susan Barrett Wick for the Plaintiff Appellant Cross-Appley. Good morning, Your Honors. Katherine Barrett Wick, Robbins Kaplan LLP for Appellant Nartron. I'd like to reserve three minutes for rebuttal. May it please the Court. Sanyo cannot use Nartron's technological know-how for free. Panasonic cannot use Nartron's technological know-how for free. In order to affirm the District Court's decision, you must conclude that under both law and equity that this can occur. The District Court found that Sanyo, under the party's contract, and Panasonic, essentially by disallowing an equitable claim, could do just that. They could benefit from the years of technological know-how and collaboration that Nartron had undertaken with Sanyo and use that know-how to profit through business with GM without paying Nartron. This cannot be the case. We know this because the DSA, the Development and Supply Agreement, which is the key contract between Nartron and Sanyo, does not allow Sanyo to do this. And equity, as to Panasonic, does not allow this. The Court must reverse. I'd like to first take a deeper dive into Nartron's contract claims against Sanyo. The District Court's interpretation of the Development and Supply Agreement, the DSA, was legal error for a number of reasons. First, it ignored portions of the DSA that expressly protected Nartron's know-how and made absolutely no reference to a product agreement. We see these provisions in 1.11, the existing property rights of Nartron, and also in provision 8.1, 9.1, and 9.3. The District Court's interpretation of the DSA also ignored critical portions of the DSA that expressly contemplated this exact scenario, where Nartron and Sanyo worked together to create components of General Motors' Q system, but where the parties did not execute any product agreements. These critical provisions are paragraph 4 of the DSA and, importantly, paragraph 5.2. A product agreement. 5.2 has this particular requirement of a product agreement that has to be executed. There was never a product agreement, right? That is correct. Okay. So I'm reading this as saying certain IP rights are covered by 5.2, but I think you're arguing there may be other IP rights that are covered by 9.3 that aren't under 5.2. Is that what you're arguing? That's certainly one of our arguments. That was our argument at the non-trial because the District Court had struck in 5.2 at summary judgment. But also I think it's important to look at the last sentence of paragraph 4. That says, parties shall hold all ownership and licensing rights to all products developed or produced under this agreement if they are not incorporated into or made the subject of a product agreement unless otherwise agreed in writing between Nortron and Sanyo. Well, what's covered by 5.2? Are you saying you can get breach of contract remedies for any violation, any of your IP rights? Yes. So if that's your position, then how do you deal with 5.2? Because it seems to deal with there being some requirement of a separate agreement for certain rights. I don't read 5.2 that way, Your Honor, and I don't think you can and still give meaning to the language that you pointed to in 9.3 and 4.0. The District Court essentially held that, held that the term products has to mean a product agreement, but that ignores these key provisions. But isn't product defined in 1.8? Products mean products individually identified in product agreements? Yes, there is a definition there, but there's also the language that I just read in 4.0, which talks about parties preserving ownership rights and licensing rights to products that importantly that were developed or produced under this agreement, but that are not incorporated into or made the subject of a product agreement. So that makes clear, so the 1.8 definition defines products if a product agreement is executed, but there's no, we can't read, we know from Basic Michigan and most other states, black letter contract law, we can't read the contract so as to render that language a nullity. So the District Court's conclusion that product could only mean products that were the subject of a product agreement would do just that. It would render that language, which talks about products developed or produced under this agreement, but not being made the subject of a product agreement. And I think that also answers your question as to 5.2 Judge Bush. So it's important to understand if you look at the beginning of language, the whereas clauses in the beginning of the DSA, there's no doubt when the party is executed, and it's important to understand that these agreements, the Confidential Disclosure Agreement, which was executed in early March, there was a letter of understanding, and then about a month later, early April, was the DSA. So these were all executed in a very short time frame when the parties were responding to interests from General Motors that could benefit both of the parties. We see from the whereas clauses in the DSA that at the time the DSA was executed, the parties anticipated a number of possible ways that their collaboration could proceed. One of them would be that Nartron could manufacture components or subsystems that would feed into the GMQ system, and Sanyo would sell those to GM. Another would be that Sanyo might manufacture, we see this in the whereas Sanyo, Sanyo wishes to manufacture products, components, and subsystems on a contract basis for Nartron. And that was really the scenario in which the parties would have executed product agreements, where they understood that one of those parties would be the, the contract uses the word supplier, but would be the party that sold the components that were a result of the collaboration to GM, and the other provided them. What happens here is that Sanyo decided that they would manufacture the components themselves after they had gotten the know-how from Nartron, with the exception of the Atmel chip. And to take back to your question, Judge Bush, on 5.2, we see this language expressly contemplated in 5.2, and it's about in the middle of the first, I guess it's all one big paragraph. So it's about a third of the way down. The parties also agree to license to the other party all industrial and intellectual property owned by the party that is necessary for the party to make or have made such products. And that's what happens here. Sanyo decided, after Nartron's employees had worked with Sanyo's employees, had taught them how to use their technology, had demonstrated what Sanyo had, why Sanyo had sought out Nartron in the first place, that Nartron was able to make the interactive center stack system work in automotives, which had some unique requirements, such as a thicker glass, when none of the competitors could do so. That's why, Your Honors, what the panel should do as to the contract is review it de novo, as you should, and conclude that in this scenario, where there was collaboration that resulted in a number of parts being sold to GM, that the royalty rate must govern. We see that in the middle of 5.2 unless otherwise defined in a product agreement. The license is at 10% of the lead party system sale price to a customer for any variance made. So this is speaking to any technology or any parts that came out of the party's collaboration under the DSA. I also want to make it clear, and it's important for the court to have this context, it's not that Nartron was just working behind the scenes and without General Motors' knowledge. Nartron actually participated with Sanyo in the pitch to General Motors. And after that pitch, and before General Motors decided to give the business to Sanyo, Sanyo told General Motors that it would be using Nartron technology. So Sanyo benefited, it traded off of, it got this business and profited mightily off of using Nartron's reputation as an innovator in this industry, being capable of doing things with a touch screen in an automobile that no other provider could do. So is there someplace in the record that you would point where Sanyo actually told GM it was going to use the Nartron technology? Yes. So it's record entry 274-2, page 18, and it's a deposition, and it's 188 lines 11 to 20. And whose deposition is it? I don't have that in front of me. I will have that when I stand up for rebuttal, Your Honor. But the quote is that, you know, it may not be a deposition because my notes say there's a price quote for the Q system given to GM, identifying the capacitive touch technology as Nartron technology, and that's in quotes. So I'll have a more precise cite for you. Thank you. Now importantly, I do want to say a few things about the, so the court should hold that Nartron has the contract right and should reverse what was, in essence, summary judgment being granted prior to trial. A contract right against Sanyo. Absolutely. What about Panasonic? Yes. So as to Panasonic, so what happened was in about two, so Panasonic and Sanyo were going through a merger process, but the merger was not complete, and there's no dispute about this. The merger was not complete, and the Sanyo entity with whom Nartron contracted did not become part of Panasonic until March 2015. So there's a period of time where Panasonic, but prior to that, in 2012 it was actually Panasonic that started making, so it no longer was Sanyo manufacturing the components that relied upon Nartron's know-how, but Panasonic was. There's an anti-assignment clause. There is. The DSA, absolutely, the DSA has an anti-assignment clause. So how can Panasonic become an assignee of the contract? No, they can't. That's, and it's also, that's actually also. Why do you have a breach of contract claim then? No, no, no, we don't. I'm sorry if I made, no. Our claim against Panasonic is solely unjust enrichment. Oh, solely. Oh, I was confused. I thought that you were bringing a breach of contract against them also. No, no, Your Honor. Thank you for helping me clarify that. That's good to know. So this contract lasted only a certain number of years, right? Correct. It had a four-year duration. We have, the parties differ as to damages and whether damages could continue to flow from breaches within that four-year period, but yes. So the period of time for the unjust enrichment claim against Panasonic is from 2012 to 2015. And it does not in any way relate to the contract. It relates to the fact that Panasonic got all the same know-how from its, it was in process, the merger, from its affiliated entity, Sanyo, and then Panasonic began to manufacture all the components that Sanyo had previously made, and then Panasonic sold it to GM. So Panasonic benefited, even though there was an anti-assignment clause, even though Sanyo had expressly contracted that it wouldn't share any information with a third party, Panasonic obtained this information improperly and used it to benefit, and then Panasonic began to make a timeout. What about the preemption argument then? So the law on MUTSA, MUTSA only displaces claims based solely on trade secret. And here we know that our claim is broader. And the reason we know that, because again, the technology that we're, excuse me, the know-how that we're using, or that we are suing over, is defined in the DSA as being broader than trade secret. And that's a key distinguishing point from the Konica case, which the district court relied upon. So specifically, I'll point you to, you see the language in the whereas clause in page two of the DSA. It talks about technology, know-how, patents, trade secrets, and non-patentable inventions. And we see similar language later. So in Konica, the parties had said all the information that we're suing over in this claim that was then displaced was defined contractually as trade secrets. Whereas here we have an entirely different scenario. The party's contract has expressed that the know-how that is to be protected and from which Nartron is entitled to a 10% royalty is broader than trade secrets. So on the merits. The extent that it were, the trade secrets were involved, would you be able to recover under MUTSA? Yes, if the defense had been timely raised, we could have amended and added a MUTSA claim for the trade secret. That's part of the, you know, I would say the prejudice and frankly the waiver. If the court reaches the merits of MUTSA, for the reasons I've explained, it shouldn't displace our claim. But here, it was really an 11th hour defense that was added right before trial, in which we didn't have an opportunity to respond to. So it's not that it would gobble up and make it impossible for us to recover from the breach, excuse me, the possible use of trade secrets. But it's that if we'd known this and it had been raised in a timely fashion, the case could have proceeded differently with some differentiation between those two. But really in this case, it's completely appropriate for the court to conclude that this was waived because it was raised very late in the litigation, right before what the parties thought would be trial. So the MUTSA is no barrier to the Panasonic and Justin Richman claim. Thank you. Good morning, Judge Moore, Judge Bush, Judge Heinrich. I am John Anding, and I'm appearing on behalf of Panasonic. At the table with me is Larissa Hollingsworth, who is on brief. It's important to start by pointing out that this was an automotive competitive bidding process. Nartron was attempting to convince Sanyo that it was the supplier that should supply the technology that was going to be furnished to General Motors. There were other suppliers involved. Atmel was one of them. Ultimately, the issue in this case is not some abstract question about whether or not there's been some wrongdoing done to Nartron. The question that the district court answered and the question that you must review is whether or not Nartron was entitled to royalties based on its unsuccessful bid to become a supplier on this automotive contract. But aren't there more questions than that? For instance, even if you can say that the contract DSA doesn't apply because there are no signed product agreements, would Sanyo be entitled to, I'm going to use loaded language here, steal the Nartron secrets and put them into Sanyo products without an unjust enrichment claim being there? Well, let's unpack that. Right. Let's start with the DSA, which is the development supply agreement. These are two sophisticated parties. Nartron, by the way, has filed over 100 cases challenging companies who have allegedly used their technology. They are considered a technology troll. They know how to protect their interests and they negotiated this contract. This contract provides a vehicle for Nartron to be compensated. And, in fact, the parties used that vehicle to compensate Nartron. Let's not forget, Nartron provided us under a purchase order a prototype and we paid them $55,000 for it. But that wouldn't entitle you to utilize the technology, say their secret technology. You are absolutely right, Judge, and let me tell you something. And we couldn't. Do you know why? The record is very clear on this. They refused to provide us with the source code for that prototype. We couldn't duplicate the prototype. The prototype was simply something that we could use to show. Now, that prototype included discrete circuitry about the size of this, impossible to use in an automotive environment. The Atmel technology that we ultimately decided on was the size of a postage stamp, perfectly appropriate for integration into an automotive environment. My point is only this. These parties knew how to contract to pay Nartron. Nartron knew how to protect its rights. And the way to do that was to get a product agreement. They never got a product agreement. So the contract is very clear. There's no entitlement to royalties under the contract. And that's what the judge held. Well, how do you deal with 9.3, which has a pretty blanket prohibition of Sanyo is not authorized to use any intellectual property rights owned by Natron or Nartron? Recall, Judge, that they rely on 9.3 not to allege some wrongful behavior, but rather to allege that it provides the right to royalties. It provides no right to royalties. The district court found there are no terms of a contract in 9.3. There's no identification of product, volume, or royalty rate. So are you saying then that Sanyo could use intellectual property rights owned by Nartron without having any remedy? I am not saying that. I am saying there is no right to royalties under this contract. And I'm also saying this, that because the DSA sets forth the exclusive vehicle for Nartron to receive compensation for technology it shares with Sanyo, it is the exclusive means for securing a royalty. Its unjust enrichment claim fails because the contract bars the unjust enrichment claim. You can't sue in quasi-contract for what you failed to have a remedy for under the contract itself. But the contract doesn't provide for this type of situation. The contract provides for situations where there are product agreements. There's no explicit provision saying, and there shall not be any unjust enrichment, or that there should be unjust enrichment. So why isn't the contract silent on that?  I understand, but if something isn't covered by a contract and yet the other side takes the technology hypothetically, there should be an unjust enrichment claim, it would seem logically. Let's make it concrete. If you look at their complaint, Nartron alleges that the technology that was utilized here is their smart touch technology. It's mentioned 14 times in their complaint. It's the basis for their breach of contract claim and their unjust enrichment claim. Smart touch technology is treated in the very first page of the DSA. In other words, if you want compensation for your smart touch technology, here's how you get it. You have to negotiate a product agreement. And as I said, these parties did negotiate an agreement under which certain technology was purchased, the prototype. But beyond the prototype, there was no product agreement. So the question becomes, well, if they didn't do what they were supposed to do under the contract, can they bring a quasi-contract claim? Well, of course, the KSR case, which this court decided is a Sixth Circuit case, provides that you cannot do that. In fact, the language in that case I think is very helpful. It says, the law will not imply a contract to rescue a plaintiff from its failure to obtain a contractual agreement to pay. The DSA provides the contractual basis for royalties. It failed to secure an agreement under the DSA that entitles it to royalties. It can't now bring a quasi-contract claim that says, oh, gee, we kind of screwed up under the DSA, but we want to bring a quasi-contract claim. But you are basically saying, then, that hypothetically, and I know you disagree with this hypo, but hypothetically, if Sanyo, in fact, stole the technology because they could unpack it from the prototype, they could use it in anything that they wanted to use it in without ever having to pay NARTRA. If hypothetically, well, but you're saying it isn't, they didn't have a product agreement, and therefore the contract precludes unjust enrichment claims. If they, if technology was taken by, again, let's be concrete. If technology, the smart touch technology was taken by us, they could have brought a claim under MUTSA, Michigan Uniform Tracing Act. Well, that's another question. Well, but it's an important one. Excuse me, but the question of if they brought a common law unjust enrichment claim, would MUTSA affect that? And MUTSA is a trade secret provision, and the question about whether there's something more than trade secrets and all that kind of stuff, which nobody really unpacked in this case, right? I mean, that's something that we would send back to the district court. Well, first of all, Judge, let me say that what they have described as the non-technology things that they're entitled to compensation for are essentially what's covered by Section 3 of the DSA. Section 3 of the DSA says, Sanyo and Nartron will bear its own development costs unless customer funded. What they describe is essentially the assistance that they were providing in an attempt to convince us to use them as a supplier. And Atmel was providing us with assistance as well. And so we're a lot of analog, another supplier. I mean, we approached over a half a dozen suppliers. There were three prototypes that were provided. This is not just about us and Nartron. This is about us looking for the most appropriate supplier. And ultimately, at the end of the day, this technology was not acceptable. That seems like it's a fact question. Well, it isn't a facts question, though, Judge, because their right to royalties is defined in the DSA. Check that box off. They don't have a right for royalties there. Their right under a quasi-contract claim is barred by the contract because it covers the technology and or these other development costs that they say they provided. It's within the subject matter of the contract. So check that box off. No just enrichment claim. In fact, it's also barred by MUTSA because to the extent that they're making a technology claim, and, Judge, I will say this, the judge below called their theory of the case as a moving target. It's right in their opinion. And this whole idea that this is no longer a technology case is ridiculous. Read the second amended complaint. It's all about technology. It's all about smart touch technology. That's the basis of their claim. So MUTSA only covers trade secrets. Is that right? It covers any confidential or secret information. And to the extent that the information they shared with us is not confidential or secret, it's not protected. So said Justice Harlan in the lure case which we cited. And to the extent that it's merely stuff that they gave us in an attempt to develop a product and convince us to use them as a supplier, paragraph three of the DSA covers that. So there's nothing here. They haven't established that they satisfied the contractual requirements for securing a royalty payment. And that was the narrow question that the court decided below. Would the remedy in unjust enrichment be royalty payments or would there be other remedies in unjust enrichment? Royalty payments. That's what they've asked for. Now, they may stand up and tell you that their theory is different on that now too because it's been a moving target. I will say this to answer your question, Judge Bush, about the claim against Panasonic. They say, well, we have an unjust enrichment claim against Panasonic. You know what? They pleaded a breach of contract claim. They pleaded that Panasonic was bound by the contract. And the judge said, well, no, there is no contract because there's no product agreement. And suddenly they began to make this claim that, oh, now Panasonic is responsible under this anti-assignment theory because Panasonic took over the Sanyo contract. In their complaint, they say, Panasonic took over the Sanyo contract. They pleaded an unjust enrichment claim, though, also. They did plead an unjust enrichment claim. They pled in the alternative. Well, they pled in the alternative. But, Judge, look at the factual pleadings, though. The factual pleadings are, and they base their breach of contract claim against Panasonic on this, that Panasonic took over the Sanyo contract and thus was responsible under the contract. It was only after they lost that argument that they came up with this anti-assignment argument. So I want to be clear here, Judge. The court resolved a narrow issue. Did these two sophisticated parties establish a protocol for determining whether or not one party would be paid a royalty by the other? And the answer is yes, and that's the DSA. And the court said a product agreement, which is the vehicle for establishing those royalties, is not in any of the provisions that they rely on, 5.1, 5.2, or 9.3. There are no terms for payment of a royalty. And you know why? I wanted to bring in here a board of the product agreement, but you wouldn't let me. The product agreement, which is an addendum to the supply agreement, has all those terms. Volume, identity, price, that's where they get their right to a royalty. And in the absence of that, they can't bring an unjust enrichment claim because they simply failed to satisfy the requirements of the contract they negotiated. Let me ask you procedurally, what posture are we in? Is this a summary judgment review or a bench trial review? Summary judgment review. Judge, ultimately, when we got to the point of trial, the court said, you know, I want briefs on construction of this contract. And that's what she took. So essentially she asked for summary judgment briefing and ultimately resolved it on that basis. Now, there's one final issue that I want to be clear about, and I don't want this to get lost in the process. By the way, Judge Moore, yes, this is a four-year contract. The district court found that it expired four years after its date, so it expired in April of 2012, which actually would have been a date that was before the launch of the product in question. So if it's a four-year contract and it expired in April 2012, then why wouldn't there be unjust enrichment claims for subsequent activity, hypothetically, of stealing the secrets or the technology which are not secrets? Because you guys told us that's not the way it works in KSR, which is a Delphi case. Once there's a contract, then there can never be any unjust enrichment claims. Or to put it more succinctly, once there's a contract claim, you can't come in here and ask for a quasi-contract. Even in the future, after the contract? Of course not. Can we look at extrinsic evidence in trying to figure out what this contract means? No. And the judge did. Why not? Because the judge read the terms of the DSA and said, look at the terms. The contract is crystal clear. The contract does not provide the elements for payment of a royalty, and that's the narrow holding of the district court. I might also point out that there's a settlement agreement out there that came up right before trial in which Nartron released us and Atmel from use of the very technology that they now claim we used. Right. And that's another question. It is another question, Judge. And I'm telling you, the question is, why didn't they give it to us before? Now, they'll say, well, you knew about it in 2009. Right. Panasonic's a large corporation. I'm not used to representing large corporations, mind you. But Panasonic's a large corporation, and the fact that they didn't remember this agreement in an entirely different context is the kind of excusable neglect that this court focused on in Hageman. And Hageman was the same deal. And actually, there's another case involving the Navy ship. A reasonable oversight is not grounds or basis for denying the right to amend. If this court should remand this case, we're entitled to bring our counterclaim here. We've stated a claim, and that claim is Nartron waived its right to sue us based on use of the Atmel technology years ago. And the failure to allow us to do that would be an injustice in this case. Thank you. Thank you. I want to start by answering the record question that you had, Judge Moore. Okay. On page 44 of our opening brief, it's the... So I guess I have a two-part answer. So this is a non-depo document. It's an email thread that began between its sealed Exhibit 25, record entry 274-4, and that's at page 29 of that sealed Exhibit 25. That was an email thread where, in the earliest interactions on that thread, it was Sanyo emailing with the GM and articulating that they knew that their third-party supplier would expect a royalty. That was Nartron. The more recent in the thread was that was forwarded by Sanyo to the key person negotiating on behalf of Nartron, explaining that they had presented... which happened later, that they understood that GM knew Nartron expected a royalty. So I want to then quickly turn to your question about extrinsic evidence. So our argument, our strongest argument for a royalty under the DSA, is based upon 5.2, which, as I articulated before, has to be read alongside paragraph 4, which expressly contemplates products developed and produced under the agreement that are not part of a product agreement. The default royalty rate is 10%, and that's the basis of the contract claim. As to the extrinsic evidence, the parties came to what Nartron thought would be a trial with different arguments about ambiguity. So while our argument that I just articulated, our strongest contract argument, as to a royalty based on 5.2, does not depend upon extrinsic evidence. You can read 5.2 in light of the DSA as a whole. What we were not allowed to do, however, was bring forth extrinsic evidence of the very type that I provided you with the record site for, which refuted their argument on ambiguity. They argued, as he did today, my colleague today, that we are unambiguously not entitled to a royalty. And we wish to present extrinsic evidence, and made an offer of proof that was rejected, that there was substantial record evidence that that was simply not the case, that the parties read the DSA to require a royalty, that Sanyo had gone so far as to articulate that expectation to GM, and that that extrinsic evidence refuted their unambiguous interpretation. But as you pointed out, Judge Bush, it was not effectually a trial. It was a sua sponte summary judgment. To wind up, your honors, NARATRON has a breach of contract claim even without any product agreement having been executed. It is based upon the totality of the DSA and the inclusion of things like 9.3, 4.0, and the default 10% royalty rate that is set out in 5.2. As to Panasonic, NARATRON has an unjust enrichment claim, which is based upon the fact that Panasonic benefited greatly from the know-how that NARATRON had provided to Sanyo under the DSA. And yet, just like Sanyo, Panasonic paid nothing for it. The case should be remanded with the court interpreting the contract to allow a 10% royalty rate against Sanyo and allowing the unjust enrichment claim to be tried to the bench. There's no other questions. Thank you for your time. Thank you both for your argument. The case will be submitted, and would the clerk adjourn court, please.